Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning and welcome again. Welcome back to the 11th Circuit. We have two cases up for oral argument this morning and we will begin with United States of America v. James Braddy. We'll hear first from Mr. Bradford. Thank you, Your Honor. May it please the court, this case turns on a traffic stop and subsequently a motion to suppress the evidence obtained during that traffic stop in the district court. And for three reasons, Mr. Braddy argues that the motion to suppress should have been granted and that the judge erred by not granting the motion to suppress. The first issue that's raised is the fact that the initial traffic stop was not a legal traffic stop. And the issue here is Officer Sullivan of the Fairland Police Department testified that he pulled Mr. Braddy over because he had bicycles on a bicycle rack on the back of an SUV and it partially obscured the tag of the vehicle. Sullivan testified that he based his traffic stop purely on Alabama law, particularly Section 32-6-51, which speaks about having a plainly visible tag on an Alabama-owned and driven vehicle. The problem that we have here is this was a Florida tag on a Florida vehicle and Officer Sullivan knew that. In fact, his very first audio on the video and audio, he calls in the dispatch and he informs him that he's on I-65 and he has a Florida vehicle, Florida tag. Counsel, I don't think that's disputed. Your argument is Section 40-12-262A says those provisions don't apply to a motor vehicle owned by a non-resident of Alabama, correct? Yes, sir, that's correct. But it also says, same provision, provided that the owner shall have complied with the registration laws of that owner's state, correct? Yes, sir, that's correct. Which here is Florida, right? That is correct. And Florida law says in Florida Statute 316.605 that every vehicle shall display the license plate or both of the license plates assigned to it by the state of registration. And all letters, numerals, printing, writing, the registration decal, and the alphanumeric designation shall be clear and distinct so they will be plainly visible and legible at all times from 100 feet away. So, Mr. Braddy didn't comply with the law of Florida when he was driving the vehicle, in this case, with the license plate obscured, correct? Judge, I would agree that the Florida statute does require the 100 feet of visibility and the letters and numbers to be visible. I think it is some dispute about whether the bicycles completely obscure the tag or whether they would be. Well, that's a different argument than you making your brief, or at least a different one than here. But you would concede, I assume, that if, in fact, the bicycle obscured some of the alphanumeric characters that you lose on this issue, correct? Well, I don't think so. Assuming that it did obscure it, assuming that the bicycles did violate Florida law, I think the problem is that Officer Sullivan testified that he had absolutely no knowledge of Florida law. That doesn't really matter to counsel. We've always held that the probable cause, which gets past reasonable suspicion, but reasonable suspicion and probable cause depends on an objective test. And you impute to the officer knowledge of all the circumstances that the officer observes or would know. It's not a subjective test. It doesn't matter. We've held that an officer can think he is violating the law and can take joy in the prospect of violating the law. But if he's not violating the law, it's a valid arrest. Yes, sir. I understand, but I think it is different in this case because his stated basis was the Alabama statute in Title 32. Yes, but you can state the wrong basis so long as you have probable cause. So long as the facts you know would justify a reasonable officer in that position to reasonably conclude that he had probable cause, it's a valid arrest. Mr. Bradford, this is Judge Lagoa. I have a question. There's a case in Alabama law called State v. Green where it's not the Alabama Supreme Court, but it's a court of appeals in Alabama. And in that case, the court held that while the Department of Revenue couldn't assess a vehicle tax against a non-resident vehicle owner, the statute in question, 36-651, certainly gave them the ability to... There was a remedy for the state if a non-resident did not display a vehicle tag properly. Are you familiar with that case? Yes, ma'am. I am familiar with that case. I think the whole thing in that case was that they couldn't also go back and punish under the separate statute. If I recall, I think Green dealt with, I want to say a commercial vehicle. It was a commercial vehicle. They said the Department of Revenue couldn't assess a motor vehicle tax against a non-resident, but it said there was violations. If there was a specific penalty for the failure to properly display a license plate and violations were considered misdemeanors, which are punishable by fines, which suggests that a non-resident who is driving through the state of Alabama who does not properly display their license tag could be subjected to this particular misdemeanor statute. And, Your Honor, I... Do you agree with that? I agree that in Green they did hold that the tag wasn't properly displayed and that that could be punished under that statute. I don't think that the person in Green was in the same set of circumstances as Mr. Braddy, if I recall correctly. Because I think, because it was a commercial vehicle, it fell under the compact and they were required under the compact to display the tag in a particular way. If my recollection is correct, I think that's the difference in that case and Mr. Braddy's situation. Counsel, this is Robin Rosenbaum. I would like to ask you about the second issue and the third issue, if that's all right with you. We'll start with the second issue. You are taking the position that the officer unlawfully prolonged the traffic stop. And so, if you had to write this opinion, what specifically would you rely on in order to find that the officer had unlawfully prolonged the traffic stop? Your Honor, I think that there are a couple of things that Officer Sullivan did that prolonged it. There was an extended discussion about the bicycles and grime on the bicycles. There was an extended discussion about the... But let me ask you a question about that. Let me ask you a question about the bicycle and the grime on the bikes. I mean, why was that not related to the issue of the bikes obscuring the license plate? And the reason I ask is because if bikes are placed on purposely to obscure a license plate and the person doesn't actually ride the bikes, would that not be relevant to the reason for the stop? Your Honor, I don't think it would be. The bicycles did not relate to any traffic violation or any traffic laws. And I think the discussion about the grime was not that that was part of the obscuring of the tag. I think just the physical presence of the bicycles was the obscuring of the tag as opposed to the grime. I think there's also an issue about prolonging where Officer Sullivan ran Mr. Brady's information through at least three databases, including the Blue Light Operation, Homeland Security Database, and NCISB. And those are... I think he can check on warrants. He can check on traffic-related inquiries, tags, traffic violations, tickets, and status of a driver's license. But I think those databases take it further. They are general criminal investigative tools. And to run it through more than one database, which would be successful, NCISB would provide Officer Sullivan all the information that he needed. Do you have any cases that would support that proposition? Your Honor, the only case that mentions the Blue Light Operation is a district court case from 2008 that was cited by the district court, which found that in that instance it was acceptable to run it through that particular database. I think actually what Officer Sullivan testified to was that he ran through those three databases and he started with NCISB because it was an out-of-state tag and an out-of-state driver's license. He didn't have access to Alabama's particular system. I think the other aspect is, as he runs these databases, eventually Sullivan gets out of the car and he leaves the writing of the warning ticket to Officer Taylor. Officer Taylor completes that warning ticket in approximately six and a half minutes. But by the time Officer Taylor takes Officer Sullivan's place, some 17 minutes have already passed. And Officer Sullivan testified that he was waiting on responses. And I think it's not unreasonable for him to be required to complete his task while he's waiting for responses from these databases. I think that to do otherwise shows some lack of diligence. And during that time is when he engaged in the conversations about... Counsel, your time has expired. Thank you, Your Honor. We would stand on the argument. Actually, I'm sorry, but you can finish that answer. And just very briefly, if you would, would you please tell us what you think the standard should be for the third issue? That is, when a dog alerts. What do you think the standard for that should be? Your Honor, I'll speak to the third issue very briefly. And I appreciate the opportunity. The reason that we trust dogs, the reason that they are allowed to do what they do, is because they are almost scientific instruments. And their objectivity is the basis of that trust. In this case, Officer Sullivan and Officer Culley testified that neither of their dogs gave a final response. I'm so sorry to interrupt, but if you could just give us what the standard, what you would have the standard be, I would appreciate that. Thank you so much. Yes, Your Honor. I think along with certification, the standard should be that the officer should testify as to the dog giving an actual final response, which is consistent with the way that the dog has been trained as is documented in the certification. May I ask you a question? I'm sorry, Judge Rosenbaum, may I ask a question related to that? Of course. Thank you. Other circuits I've heard have not required a final response for a drug detection dog, where the dog and the handlers have the certification and training. Why should we not follow those circuits? Why should we require a final response? Your Honor, I think in this case, when the video is viewed and it's compared to the testimony of the officers, what you see on the video of the dog's actions do not coincide with what the interpretation of those actions are according to the officers. At some point, there has to be some definitive action by the dog. Otherwise, it just degrades into a situation where we are relying on the subjective belief of the officer in interpreting a dog's stance or whether it wags its tail, whether it closes its mouth, whether it arches its back. Those are the things that we're testifying to in this case as the signs that the dog was on odor. I know the 10th Circuit has specifically held that that's not required, that a certification is enough, and they're not going to require an absolute alert. But I think there needs to be some standard that what we view on the video, what the officer testifies to, is consistent with what they say their training is. Because the training for dogs is very specific, and they're trained in a very particular way, and there should be a very definitive alert to some degree or the other. In this case, there was not. Thank you, counsel. Anything else? Thank you. Judge Miller? No. Judge Karnes? No. No, thank you. Judge Rosenbaum? All right, thank you. Mr. Bradford, you have reserved five minutes for rebuttal. We'll hear from Mr. Martin. Mr. Martin, I'm going to give you an extra two minutes since we went over with Mr. Bradford. Thank you, Your Honor. This is George Martin for the United States. May it please the Court. This Court should affirm the District Court's denial of the defendant's suppression motion and the admissibility of the 62 kilograms of cocaine and $40,000 cash that were found in the defendant's vehicle during the stop. The District Court conducted a thorough hearing where it heard evidence from both sides. It found the officer's testimony credible and specifically rejected the defendant's expert testimony. And then in a thorough and well-reasoned opinion, it correctly concluded that the officers conducting the stop acted reasonably throughout. Indeed, Officer Sullivan properly stopped the defendant for an obstructed tag. He developed reasonable suspicion that criminal activity was afoot. And then he conducted a lawful search after two drug dogs trained to detect drugs alerted. Mr. Martin, this is Judge Begum. May I ask you a question? If, assuming for the sake of argument, that Section 4012-262 does not apply to non-resident motorists, or Section 32-651 does not apply to non-resident motorists, was Officer Sullivan's mistake of law objectively reasonable? It was, Your Honor. And this Court does not need to accept the defendant's invitation to construe these statutes. The District Court did not do so because it found, and this Court should also find, that Officer Sullivan acted objectively reasonable in concluding that the Alabama law allowed him to stop this vehicle. Even if his interpretation of the law was mistaken, it was a reasonable interpretation under an objective standard. And as the Supreme Court has held, the Fourth Amendment is flexible enough to excuse that sort of mistake of law. I'm sorry, Counsel. This is Judge Carnes. Mr. Martin, why is it, looking at the plain language of the Alabama statute, if you don't consider Florida law, why is it a reasonable mistake? It does not apply to vehicles owned by non-residents of Alabama. Well, what Officer Sullivan faced out there on the interstate that morning was Section 32-6-51, which uses very broad language. It says that every operator must have a visible tag. And as you pointed out in Mr. Bradford's argument, even this section in Title 40 that the defendant relies on requires out-of-state drivers to conspicuously display their tags. These statutes are read together. That's not what it provides. What it provides is that the owner shall have complied with, end of quote, the registration laws of his resident state. Then you look to his resident state, Florida, and they require the conspicuous. I don't understand the good faith. The statutes either require it or they don't, or they're vague. And here, they're not vague. Alabama law requires compliance with the registration state's requirements, and the registration state's requirements plainly require visibility. I don't understand the good faith business. Well, Your Honor, as I mentioned, the primary statute here in Title 32 uses the very broad language of every operator. Officer Sullivan and other law enforcement officers glean important information from running information visible on the tags, such as whether it's expired, whether it's been switched, whether the vehicle is stolen, whether the car, the automobile, is subject to BOLOs or warrants. And it makes no sense, and it's reasonable for an officer to assume that both in-state and out-of-state drivers must display their tags. It makes no sense that the law would allow out-of-state drivers to drive through the state with a concealed tag. But that's exactly what it provides if the state of registration doesn't prohibit concealing the tag, which, of course, they all do. I mean, they must. What's the point in having a tag requirement if you don't have to display it? That's true, Your Honor. And the statute in Title 40 does require that BRADI have complied with the Florida law, but the Alabama law incorporates that by explicit reference into the Alabama code. So it was reasonable for that reason. Construing that statute along with the statute in Title 32 makes it reasonable for the officer to believe in good faith that the law required out-of-state drivers to display their tags. Also, there's another provision in Title 40, Section 40-12-242, I believe, that also discusses the display of license plates by drivers. And it was reasonable to believe that when Section 40-12-262 refers to out-of-state drivers not having to comply with the requirements of the earlier section, that it was referring to Section 242 in Title 40 and not to Title 32. Counsel, this is Robin Rosenbaum. I'd like to change the subject for just a moment, if you don't mind. I'm interested in your thoughts on the second issue and the third issue. So with respect to the second issue, my question is, why was it okay for the officer to take so long before he even started writing the warning here? I mean, isn't there some amount of diligence that's required? Otherwise, we would have a situation where we would reward officers for keeping people at the side of the road for longer than they really needed to. And it seems like an awful lot of time went by here. Why is the amount of time that went by here okay and within the bounds of diligence? That's the first question. The second question is, what is the standard that you think we should adopt with respect to performing dog smiths? To answer your first question, Judge, the officer is – there's no set time limit for starts. It just needs to be done in a reasonable amount of time that it takes to conduct a stop or a reasonable amount of time. First off, the stop didn't actually begin until after a minute on the video. The first minute is the actual cars pulling over to the side of the interstate. And a viewing of the video, as the district court did, shows that the stop – that Officer Sullivan pursued the stop with reasonable diligence. He – much of the delay was in asking questions that were prompted by the defendant's responses to questions about his driver's license and about his itinerary. It was – the stop proceeded with diligence. He asked for safety purposes, and according to his training and usual routine during traffic stops, Officer Sullivan asked the defendant to come to his car so that they would both be safer and so that Officer Sullivan could enter the information into the databases that he was going to use to check the defendant's information. He had to power up his computer because this was the first thing in the morning, and as he testified, as soon as he was logged in, he began entering the information. The video shows that, as the district court found, that the stop was not delayed in any way to pursue other criminal investigations. It was all reasonably related to the traffic stop and the issues with the obstructed tag. To – regarding the dog sniff, the Supreme Court in Florida v. Harris ruled that the district – that district courts, trial courts reviewing these situations should apply a flexible, common-sense standard based on reasonableness. The officers should be able to testify about their training and their dog's training, how their dogs indicate when they alert, and to identify during a particular stop when the dog alerted. How else is a district court tasked with making factual findings to determine, you know, what happens if they don't hear the officer's testimony? The – really, the issue of whether a final response or just a mere indication is required is moot in this case because, as Officer Sullivan testified, the first dog actually gave the final alert by scratching at the car as he made his first pass down the driver's side of the car. It was – it was the second dog that it gave the – it gave an alert but not the final alert because it could not pinpoint the source of the drugs. It – it detected the odor and gave the initial response but could not pinpoint the source because of the conditions on the road at the time. And so it – that second dog did not give the alert – the final alert. So, regardless of the standard, the district court's finding in this case that the dog did give – the first dog did give the final alert is correct and should be affirmed. If there are no other questions, then I will yield the rest of my time and rely on the briefs and argument that have been made. Thank you, counsel. And we will hear again from Mr. Bradford. Yes, Your Honor. I would speak very quickly to – this is not a case where Officer Sullivan had to make an interpretation of the application of an Alabama statute that's comparing it to another statute or try to interpret some ambiguous statute. The statute in Title 40 is unambiguous and it flatly states that out-of-state drivers – Counsel, this is Judge Lagoa. May I ask a question? Why should we not read 32-651, which is what the statute that Officer Sullivan thought was violated? Why shouldn't we read every motor vehicle operator for its plain meaning, which it uses the word every motor vehicle operator? And there isn't anything in there to suggest that it does not apply to a non-resident. And in the Green case, obviously there's an appellate court in the state of Alabama that thinks it does apply to non-resident vehicles. So how is it not objectively reasonable for Officer Sullivan to think that not being able to plainly see the tag on a non-resident vehicle was a violation of this particular statute? I think the answer lies in the specificity in the Title 40 statute. It's unambiguous as to its application that it doesn't apply to non-state residents. And it is more specific than the Title 32 statute. I think it predates the taxation provisions. The title and tags predate even the title registration law in Alabama, which didn't come about. But why should Officer Sullivan be relying on Section 4012-262? Why shouldn't it be construed that it just applies to sections within that portion of the Alabama Code? Because there are certainly different sections. One is Title 32, which is defined as motor vehicles and traffic. And the other one is Title 40, which is under revenue and taxation. Aren't those separate sections? Your Honor, I think they are. I think the problem with having him rely on Title 32 is the various states have various regulations about how they display their tags. Some require front and back tags. Some require certain clearances on the tags. And it puts him in a position where he's going to apply an Alabama statute regardless of whether you're a resident or not, and regardless of whether your state mirrors Alabama's regulations on tags. And so I think the clearer route is simply abiding by the Title 40 statute that says it doesn't apply at all. And what does apply would be the home state regulation. I would like to speak to the dog alert. I think part of the problem here is the testimony at the hearing was very clear that that first alert, as the government described it, came at a point where, according to Officer Sullivan, Lieutenant Culley had not even given the dog the command to start his search. And that alert was missed by Lieutenant Culley. He didn't see that. Counsel, I thought the court found, or at least the undisputed testimony was, the reason he didn't see it, he was worried about the traffic being hit by some of the speeding cars. And so he was looking at the traffic while Sullivan was looking at the dog who went up and started scratching the car. Am I wrong about that? No, sir. That is factually true. But I think the point being that Lieutenant Culley had not given his command for the dog to even search. And, you know, part of a well-trained dog is it follows your commands to search, not search. And it starts and stops when you tell it to. Well, I mean, that's your interpretation. But the district court found the facts to the contrary. He credited the testimony of Sullivan that the dog, the first dog, had alert. And he credited the testimony of Sullivan about the subsidiary facts on which he based the opinion he had alerted. And at least implicitly in that is that some dogs alert even when they're not told, okay, start your task, let me know. I mean, you've got to prove that the district court, I mean, I'm sorry, you've got to persuade us that the district court's findings, including the ultimate finding of whether there was an alert or not, was clearly erroneous, don't you? Yes, sir, I did. And I think in this instance, if you look at the video and you look at Sullivan's testimony, Sullivan says that he's sitting in the car and he's watching Lieutenant Culley. And as Lieutenant Culley goes by the front door, he misses the dog alerting. And that's at a point where the dog hasn't started searching yet. The video shows a very different situation. In the video, Lieutenant Culley actually goes by the driver's side door five times while Sullivan is sitting in the car. It's not until the sixth pass of the door that Sullivan gets out and goes to Culley and speaks with him about the dog alerting. Obviously, by then, I would assume that Lieutenant Culley had given the search command. So, I mean, I think there's a vast difference between his testimony and what's seen on the video. And that severely undercuts his credibility. I think that can't be relied on. He said that he basically got out of the car and went to Culley the first time he saw the dog alert. But according to the video, Lieutenant Culley went by the driver's door of the car seven times total. And it wasn't until the sixth time that Sullivan acted on something that he saw. So, I think there's problems to rely on Sullivan. The district court could credit some of his testimony, but not all of it, couldn't it? Don't district courts routinely do that? Yes, sir. It very well could. Go ahead. I'm sorry, Judge. I think the other problem is the way that Sullivan describes what the dogs do. One, he's interpreting someone else's dog. But when he does interpret his dog and or Lieutenant Culley's dog, he speaks in terms of things that happened in the blink of an eye, very quickly, that he bladed his body toward the car, he closed his mouth, his tail went red, he changed his breathing, he changed his body posture. And these things are very open to interpretation, and they're not what other cases have recognized as the two basic ways these dogs are trained, in passive and aggressive alerts, where an aggressive alert where the dog is aggressively scratching or pawing at a source, or in a passive alert where the dog makes a very definitive motion. Watching the video, it's nearly impossible unless you're Officer Sullivan. To make a determination that the dog is doing these things, because the dogs are constantly walking, their mouths are open and closed, the tail's wagging. And I think it comes, in this case, it comes down to what we're relying on for the alert is strictly the subjective interpretation of a dog's behavior by Officer Sullivan, and not something that is definitive or obvious in the dog's behavior. And the training that dogs receive is meant to make that response obvious, to make it clear, and to make it definitive. And I think we severely undercut the whole reason we rely on these dogs if we allow the alert to be interpreted by an officer in such a way that, in this case, I think Sullivan has said that there was no final response at all by either dog. And so what we're left with is things that he would refer to as a head check or an odor response, and these subtle movements by a dog that there's literally no way to verify on the video. And there's no point in time when someone could say, you know, that is a definitive motion by the dog, that is an alert. And I think that just completely undercuts the whole purpose of having the dog out there and relying on the dog as an objective, almost scientific instrument. And I think that's what all the law on dogs is based on. Other than that, Your Honors, I would stand on the arguments that we've made in our initial brief and our reply brief. And unless Fortin has any other questions, I would yield with my time. Thank you, Counsel.